IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
May 25, 2021 Session

## STATE OF TENNESSEE v. RICHARD G. WILLIAMS, KIPLING COLBERT, JR., AND CHRISTOPHER BASSETT, JR.

**Appeal from the Criminal Court for Knox County**
**Nos. 110855, 110856, 110857    Steven Wayne Sword, Judge**

———————————————————

### No. E2019-02236-CCA-R3-CD

———————————————————

A Knox County jury convicted the defendants, Richard G. Williams, Kipling Colbert, Jr., and Christopher Bassett, Jr., of multiple felonies based on the December 17, 2015 shooting death of fifteen-year-old Zaevion Dobson.  On appeal, all of the defendants challenge the trial court's admission of a YouTube video of the defendants rapping. Defendant Bassett appeals the trial court's denial of the motion to suppress his statement to the police.  Defendants Colbert and Williams challenge the sufficiency of the evidence, and Defendant Williams, solely, asserts that the trial court erred when it admitted evidence of his involvement in an April 2016 shooting and that the effect of cumulative errors during the trial warrants appellate relief.  After review, we affirm the trial court's judgments.

 **Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and J. ROSS DYER, JJ., joined.

Gerald L. Gulley, Jr. (on appeal), and Christopher M. Rodgers (at trial), Knoxville, Tennessee, for the appellant, Richard G. Williams.

Rhonda F. Lee, Powell, Tennessee, for the appellant, Kipling Colbert, Jr.

T. Scott Jones, Gena Lewis, and Kelly Tanner (at trial only), Knoxville, Tennessee, for the appellant, Christopher Bassett, Jr.

Thomas H. Castelli and Stella Yarbrough, Nashville, Tennessee, for the amicus curiae, American Civil Liberties Union Foundation of Tennessee.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Charme P. Allen, District Attorney General; and Philip M. Morton and Ta Kisha M. Fitzgerald, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION
### I. Facts
### A. Background

The defendants' convictions all arise from a shooting at an apartment in Lonsdale Homes in Knoxville, Tennessee, on December 17, 2015 ("Lonsdale shooting"). Lonsdale Homes is located west of I-275 and considered to be part of the Crip gang's "territory." Nine persons were present at the Lonsdale apartment, with six teenagers gathered outside on the porch. None were gang members, but the shooters were associated with the Bloods gang, whose "territory" is east of I-275 in Knoxville. The police investigation revealed that numerous shots were fired at the Lonsdale apartment from four different guns. Tragically, a fifteen-year-old boy, Zaevion Dobson, was shot and killed as he tried to shield a friend from the hail of bullets. No one other than Zaevion Dobson was physically injured.

In June 2017, a Knox County grand jury returned a twenty-seven count indictment against the defendants for their role in the shooting. Defendant Bassett was charged with ten counts of felon in possession of a weapon, one count of the first degree premeditated murder of Zaevion Dobson, eight counts of attempt to commit first degree murder, and eight counts of employment of a firearm during the commission of a dangerous felony. Defendants Colbert and Williams were charged with the first degree premeditated murder of Zaevion Dobson, eight counts of attempt to commit first degree murder, and eight counts of employment of a firearm during the commission of a dangerous felony.

Prior to trial, Defendant Bassett filed a motion to suppress the statement he made to the police in the early morning hours of December 18, 2015, and all of the defendants filed motions seeking to exclude a YouTube rap video involving the defendants. The trial court denied these motions, and the case proceeded to trial. These motions will be discussed in more detail in the analysis portion of this opinion.

At trial, the State's theory of the motive for the Lonsdale shooting in west Knoxville was that the Lonsdale shooting, in Crips gang "territory," was gang-related and in retaliation for an earlier shooting that had occurred that evening on Dallas Street in east Knoxville, which was in the Bloods gang "territory." As part of its proof of motive, the State introduced evidence of four other shooting scenes believed to be related to the

2

Lonsdale shooting.  These shootings were located at: Fort Promise and Virginia Avenue (west), Dallas Street (east), Green Hills Apartments (east), and Townview Towers (east).  For purposes of clarity, we summarize the shooting incidents in chronological order.

## B. Proof at Trial

Knox County Emergency Communications District custodian of records, Michael Alan Mays, identified the computer aided dispatch ("CAD") reports for four different 911 phone call recordings from the night of December 17, 2015, and the early morning hours of December 18, 2015.  The first CAD report was for December 17, 2015, at 4:08 p.m.  A caller reported gunfire in the area of Fort Promise and Virginia Avenue in the western portion of Knox County, Tennessee.   Police investigation revealed no one who sustained injuries from the shooting.

The second CAD report contained information about a 911 call requesting help for a shooting that occurred on Dallas Street in east Knoxville. ("Dallas Street shooting").  This call was initiated at 7:18 p.m. on December 17, 2015.   The third CAD report documented several phone calls, beginning at 10:12 p.m. on December 17, 2015, for a shooting on Badgett Drive (Lonsdale shooting).  One of the calls, received at 10:15 p.m. from an apartment on Badgett Drive in Lonsdale, reported "8 guys out front in black . . . shooting at [a family member's] friends."

The final CAD report for that night showed several calls placed on December 18, 2015, beginning at 1:59 a.m., about "shots fired" and a car crash on Natchez Avenue in the Green Hills apartment complex ("Green Hills shooting").  The recordings for these 911 calls were played for the jury.

The State introduced another CAD report documenting a call from several months later.  This call related to a shooting on Lula Powell Drive at the Townview Towers on April 2, 2016 at 3:00 a.m. ("North shooting").

**Dallas Street Shooting**
*December 17, 2015, approximately 7:15 p.m.*

Knoxville Police Department officers responded to a shooting incident on Dallas Street ("Dallas Street residence") in East Knoxville, Tennessee.  Inside the Dallas Street residence, KPD Officer Jimmy Wilson found Lisa Perry lying face down in the bathroom with a wound to her back side.  Officer Wilson remained with Mrs. Perry until medical personnel arrived, and then he assisted with securing the scene.  KPD Officer Michael Traylor spoke with Mrs. Perry's daughter, who was also inside the house, before joining officers outside to help with crowd control as people began arriving on the scene.

3

Meanwhile KPD Lieutenant Robert Taylor arrived and taped off the crime scene, which extended from the intersection at the corner of the residence to an area slightly north of where "the event had occurred." The Dallas Street residence sat on a narrow street, and law enforcement found numerous bullet casings from the shooting lying on the street in front of the house. Officers believed the shooting was a drive-by shooting involving the roadway as well. Lieutenant Taylor did not enter the Dallas Street residence but spoke to several people at the scene and assisted in directing Mrs. Perry's concerned family members to the hospital.

Officer Traylor, Officer Wilson, and Lieutenant Taylor's police cruisers were all equipped with in-car video recorders. The State played portions of the cruiser video from all three officers' cruisers. Officer Traylor's in-car video showed a portion of a black BMW arrive at 7:39 p.m. A man wearing a dark jacket with grey sleeves exited the BMW and ran toward the Dallas Street residence. This man was later identified as the victim's son, Brandon Perry. At 7:41 p.m., a man wearing dark pants and a dark hoodie with the hood pulled up over his head walked toward the Dallas Street from the area where the black BMW was parked, followed by another man wearing a dark hoodie with the hood pulled up and black pants with a white stripe down the side. Officer Wilson's and Lieutenant Taylor's cruiser video also showed these two men at the scene. Lieutenant Taylor believed the men were relatives of the victim. The men were not hostile and were clearly upset by the shooting. Officer Traylor's in-car video showed the two men walking back toward the black BMW at 7:43 p.m.

Officer Wilson identified the in-car video from his cruiser. As the State played the recording for the jury, Officer Wilson identified the arrival of a black BMW at around 7:39 p.m. and Brandon Perry running toward the Dallas Street residence. At 7:41 p.m., the man wearing the dark-colored hoodie and pants walked past Officer Wilson's car toward the Dallas Street residence. Officer Wilson believed that the man wearing dark clothing with his hood up was one of Mr. Perry's friends. He recalled that the man wearing the dark clothing and the man wearing the dark clothing with the white stripe down the pant leg entered the crime scene area but did not did not go inside the Dallas Street residence with Mr. Perry. At 7:43 p.m., the man wearing the black pants with the white stripe walked back toward the BMW, followed shortly thereafter by Mr. Perry, who at this point was wearing only a grey shirt.

KPD Officer Edward Johnson processed the Dallas Street shooting crime scene. He identified photographs of the residence that depicted bullet defects to the outer walls of the house and bullet defects caused by bullets entering through the exterior wall into the home. Law enforcement found bullet defects throughout the home that showed bullet entry through both the side walls and the front wall of the home. Bullet defects were

4

identified in the dining room area, bathroom, kitchen, and bedrooms.  Outside the house on the corner of Mansion and Dallas Street, law enforcement found cartridges cases lying on the ground.  More cartridge cases were collected from the grassy areas in the front and back of the house and on the driveway.

While at the scene, Officer Johnson observed Mr. Perry enter the house briefly.  He appeared "really calm" and was "very quiet" as he watched medical personnel treat his mother, Mrs. Perry.  Officer Johnson found Mr. Perry's demeanor "a little unusual" for a shooting scene.  After a short time, Mr. Perry left the Dallas Street residence.

KPD Violent Crimes Investigator AJ Loeffler reported to the Dallas Street shooting scene.  When Mr. Perry arrived at the scene Investigator Loeffler also spoke with him.  Mr. Perry was visibly upset and concerned about his mother's welfare.  Investigator Loeffler told Mr. Perry that his mother was going to UT Hospital for treatment and asked to speak with him about the shooting.  Mr. Perry spoke briefly with Investigator Loeffler before turning his attention toward his mother.  He left shortly thereafter without speaking again to Investigator Loeffler.  In footage from the cruiser video, Investigator Loeffler identified Mr. Perry, dressed in dark clothing, walking out to a black BMW and leaving the scene.

Investigator Loeffler also spoke with Mrs. Perry's husband, who directed him to graffiti on his backyard fence and graffiti on a sign on the opposite side of the street.  Officer Johnson photographed the graffiti on the fence associated with the Dallas Street residence that read, "Trees" and "West Side."  A street sign located across the street from the Dallas Street residence had been "tagged" with "CK."

Investigator Loeffler explained that the Dallas Street residence sat on a corner lot.  He believed the shooters drove down Mansion Street and began shooting the side of the house, turned on to Dallas Street, and continued shooting as they drove by the front of the Dallas Street residence.  Based on gun fire defects on the side of the house, Investigator Loeffler believed the shooters fired backward when their vehicle passed the front of the house, shooting three sides of the residence in total.

After gathering information at the Dallas Street residence, Investigator Loeffler identified Mr. Brandon Perry, Ms. Jasmine Mason, Defendant Bassett, and Defendant Williams as people he wanted to locate and speak with about the shooting.  Investigator Loeffler did not have any contact with Defendant Bassett at the Dallas Street crime scene, but he later identified Defendant Bassett in video footage from the scene.  After leaving Dallas Street, Investigator Loeffler went to several addresses looking for these individuals but did not locate them.

Meanwhile, shortly before 8:00 p.m., Defendant Colbert sent a text message to Larry North notifying him that he was coming to "get the heat." Mr. North understood Defendant Colbert to be referencing a pistol. At the time, Mr. North was at an apartment in the Green Hills complex. Mr. North said that the defendants came to the apartment following the Dallas Street shooting and were "quiet." Defendant Bassett told Mr. North about the Dallas Street shooting. The men informed Mr. North that they would be leaving at 9:00 p.m. to go "out west." The men left at that time armed with guns.

**Lonsdale Shooting**
*December 17, 2015, approximately 10:00 p.m.*

Latasha Colbert[1] lived on the west side of Knoxville, Tennessee, on Badgett Drive ("Badgett residence") in Lonsdale Homes with her two children, ages nine and six. Latasha's best friend's teenage niece, Faith,[2] would often come to Latasha's house to spend time or babysit Latasha's children. Because of Faith's relationship with Latasha, teenagers often would gather on the back porch of the Badgett residence to socialize. On December 17, 2015, the last day of school before Christmas break, Faith arranged for she and her friend, Kiara, to spend the night at the Badgett residence.

That evening, after the school basketball game, a group of kids gathered on the back porch while Latasha and her children watched videos in the upstairs portion of the Badgett residence. At some point Latasha's children asked to go downstairs to get a drink, and, while they were downstairs, Latasha heard gunfire. She began walking down the stairs calling for her children to come upstairs, go to their room, and lay down on the floor. As she retrieved her phone to call 911, Faith called up the stairs to her, and Latasha told Faith and Kiara to come upstairs as well. While on the phone with the 911 operator, Latasha saw her children standing in the doorway. Before she could reprimand them for not lying on the floor as she had instructed, she saw broken glass on the floor of the bedroom from a bullet that had come through the window. She ushered all four kids into her bedroom and shut the door.

As Latasha spoke on the phone with the 911 operator, she walked downstairs, opened the back door, and saw Zaevion Dobson lying face down. She did not detect any breathing, so she shut the door, locked it, and told the 911 operator she believed the victim was dead. When she turned around, Faith was standing there. Latasha tried to redirect Faith upstairs, but there was a knock at the front door and someone called out

---

[1] Although Latasha Colbert shares the same surname with one of the defendants, it does not appear from the record that there is any familial relationship between the two. For purposes of clarity, we will refer to her by her first name. We intend no disrespect by so doing.

[2] For purposes of clarity and privacy, we identify the victims who were on the porch during the Lonsdale shooting by their first names. We intend no disrespect by so doing.

identifying himself as "Zack." Faith insisted they open the door, saying that Zack was the victim's brother. When Zack entered, he asked where the other kids had gone. Latasha urged Zack to go home, but he refused. He walked through Latasha's kitchen to the back porch and saw the victim lying on the porch. He began crying and telling the victim to "[g]et up." Latasha told Zack, "I think he [is] gone already" and shut the porch door. Zack fled from the apartment through the front door.

Faith returned upstairs while Latasha called a friend to tell him about the shooting. She walked out her front door and saw a black BMW back out of her driveway and leave. Several minutes later she saw the same black BMW on the opposite side of the street in front of her building. At this point, Zack had returned and was standing with Kiara and Faith in the front yard. With growing suspicion about the black BMW, she urged everyone inside her apartment to wait for the police.

Zack, the victim's older brother, had attended a basketball game with the victim on the last day of school before Christmas break. After the game, Zack and the victim returned home with a friend, Xavier, "checked in" with their mother, and then walked the short distance to the Badgett residence to meet up with Louis, Faith, and Kiara. They had been talking on the back porch for about ten minutes when Louis noticed "a whole bunch of people" walking toward them and suggested that they "need[ed] to run."

As Zack stepped off the porch, he heard the first gunshot, and he began running. As he ran, he could hear gunfire near him. Zack hid behind a shed in the backyard of another residence until he felt certain the gunfire had ceased. He then returned to the front door of the Badgett residence. He knocked on the door while he waited for someone to let him in. Upon entering the residence, Faith directed him out to the back porch where Zack found the victim. Zack told the victim to "get up," but the victim was bloody and non-responsive. Distraught, Zack ran down the street to a family member's home and asked them to contact his mother before returning to the crime scene.

Zack testified that the shooters all wore dark-colored clothing. He did not know any of the men, and he had no idea why the men fired guns at them. Zack had lived in the Lonsdale community his entire life and was aware of gang activity in the neighborhood. He said that "Crips are in Lonsdale." He denied any gang involvement, asserting that he was "an athlete."

Louis had lived in the Lonsdale area for most of his life and confirmed that the Lonsdale neighborhood was gang territory associated with the Crips. Louis did not participate in gang activity and described himself as "an athlete." On the night of the shooting, he met Faith halfway between his home and the Badgett residence. He had invited Zack over to the Badgett residence, but he arrived before the other boys so he

waited inside the Badgett residence. When the others arrived, the group assembled on the back porch to talk and listen to music. After about ten minutes, Louis noticed four men in the middle of the street, dressed in black. He said all of them wore black hooded sweatshirts with the hoods pulled up so that he could not see their faces. One of the men had his hands in his hoodie. Louis told the others, "it's time to go." As soon as Zack stepped off the back porch, the shooting began.

Zack, Xavier, and Louis all ran away from the Badgett residence, but Zack ran one direction while Xavier and Louis took another route. Xavier and Louis ran until they no longer heard gunfire and then hid underneath a bulldozer. While they were fleeing the gunfire, a friend who lived in the Lonsdale community, Devante Patrick, called Louis to warn him about the men. Earlier in the evening, Louis had invited Mr. Patrick to join them at the Badgett residence, so Mr. Patrick knew the kids were on the back porch, but he had not joined them. Louis and Xavier arranged for Mr. Patrick and Jadarius Sackie to pick them up. Xavier and Louis did not know any of the men who approached them or any reason why the men would fire weapons at them.

Faith described everyone's location on the Badgett residence back porch before the gunfire began. Kiara and Faith sat in porch chairs, Louis and Zack sat on the porch railing, the victim stood next to the door of the apartment, and Xavier also stood on the porch as the kids laughed and talked about the basketball game. As they talked, Louis drew their attention to three or four men standing near the stop sign. The men were lined up, facing the back porch, and wearing dark clothing and began shooting at the back porch.

The victim, Kiara, and Faith did not flee when the gunfire began but stayed on the back porch. Initially, Faith thought the men were setting off fireworks but then realized it was gunfire. The victim pulled Faith down, and the three kids began pulling chairs on top of themselves for protection. When the gunfire died down, Kiara said she was going to open the apartment door and told the victim and Faith to try to crawl inside. Kiara opened the door and when Faith tried to get up, she realized she was trapped beneath the victim who was not moving. As Faith moved out from underneath the victim, she saw blood and ran inside the apartment.

On cross-examination by Defendant Colbert's attorney, Faith confirmed that she spoke with the police on the night of the shooting and told the police that there were three shooters, two taller and one shorter man. Faith denied any gang affiliation.

Kiara, sixteen at the time of the shooting, testified consistently with Faith's testimony. Louis drew her attention to the men, saying they needed to go inside the Badgett residence. She saw two men but believed there were more, all wearing dark

clothing. Louis ran from the porch, and the men began shooting their guns. Kiara was fearful as bullets struck the door and walls around her. The victim dropped to the ground as soon as the shooting began, and Kiara followed before trying to get Faith on the ground too. Kiara denied pulling chairs on top of them and guessed it was the victim who had moved the chairs in an attempt to block the shooting. She knew the back door to the apartment was unlocked, so she opened it and ran inside. Kiara told Faith and the victim to come inside. Faith ran inside, but the victim did not. The two girls fled upstairs and, once upstairs, Faith told Kiara the victim had been shot. When the girls returned downstairs, the porch door was open and blood was "coming out into the kitchen." Kiara denied any gang affiliation.

Devante Patrick, seventeen at the time of trial, was aware of gangs in the Lonsdale community, specifically, the Crips. On December 17, 2015, he arranged with friends to meet at Jadarius Sackie's house to play video games. As he was leaving his apartment in Lonsdale Homes, he saw eight men, all wearing black, walking down the street, which caused him to hesitate. He did not recognize the men from the neighborhood and believed they were acting suspiciously. All of the men continued down the road toward the Badgett residence except one, who stopped and spoke to Mr. Patrick. The man said, "What's brackin?" Mr. Patrick recognized the word "brackin" as a gang term. The man's use of this term indicated to Mr. Patrick that the man was from "the east side" because he spoke like a member of the Bloods gang. Mr. Patrick responded, "What's up, fem?" The man asked "What you bang?" and Mr. Patrick responded, "I don't bang." Mr. Patrick explained that the man's second question was an inquiry about Mr. Patrick's gang affiliation.

Troubled by the men's presence, Mr. Patrick went back inside his home and told his grandmother to go upstairs. Mr. Patrick was "shocked" by the men's presence because he would not have expected to see Bloods gang members outside their East Knoxville territory and in the Lonsdale community in West Knoxville. After convincing his grandmother to go upstairs, he called Louis to warn him about the men. Louis was running at the time of the call, and he told Mr. Patrick that the men had fired guns on them. Louis asked Mr. Patrick "to come get [them]." Mr. Patrick immediately arranged for a ride to pick up Louis and Xavier at a Dollar General Store.

Later that night, Mr. Patrick went to the police department and provided a statement. Mr. Patrick described for police the man who spoke to him but was unable to identify anyone from a photographic lineup. The man was approximately eleven feet from Mr. Patrick when the man spoke to Mr. Patrick.

In the weeks following the shooting, a family member sent Mr. Patrick a rap video and asked if he recognized any of the men in the video from the night of the shooting.

9

Mr. Patrick watched the video and then showed Zack, telling him that those were the men he had seen walking toward the Badgett residence the night of the shooting. The State played the rap video for the jury, and Mr. Patrick identified Defendant Colbert in the video as the man who asked him, "What's brackin?"

On cross-examination by Defendant Colbert's attorney, Mr. Patrick confirmed that his identification of Defendant Colbert in the rap video was a week or two after the shooting. Mr. Patrick told Zack about the identification, but he did not go to the police with his identification. Upon further questioning by the State, Mr. Patrick identified Defendant Colbert in court as the man who spoke to him right before the Lonsdale shooting.

KPD evidence technicians Bethany Fine and Rebecca Taylor arrived at the Lonsdale shooting crime scene at 10:25 p.m. They entered the crime scene area and approached an apartment building where a body, covered with a blue sheet, was lying on the porch. They first photographed the body and surrounding area before inspecting the street where shell casings had been located. Ms. Fine and Ms. Taylor marked, photographed, and collected thirty-four casings. Twenty-three of the casings were .40 caliber shell casings and eleven were 9mm casings. Based upon the location of the casings that were in the street, Ms. Taylor estimated that the shooters were standing in the street while firing.

Ms. Taylor documented bullet defects to the porch where the victim was lying and to the house and railing of the house located "catty-corner" to the Badgett residence. Ms. Taylor photographed broken windows above the porch where the victim was lying. She also photographed bullet defects on two vehicles parked in the area.

At approximately 10:00 p.m., Investigator Loeffler learned of the Lonsdale shooting. When he arrived in the area, he found a chaotic crime scene. He gathered information from the officers present and observed the victim on the back porch of the residence and bullet damage to the residence. Investigator Loeffler spoke with Latasha and identified multiple witnesses who were present on the back porch at the time of the shooting. The witnesses were transported to the KPD. Investigator Loeffler remained at the scene for a time trying to identify any other witnesses before returning to the police department to participate in interviewing the witnesses. Investigator Loeffler spoke with Mr. Patrick who reported that the man he later identified as Defendant Colbert had a gun in his waistband when he stopped and spoke to Mr. Patrick right before the shooting.

Based upon the information gathered, law enforcement developed three possible suspects, Mr. Perry, Kedaris Gilmore, and Defendant Bassett and composed three

photographic lineups, each containing a photograph of a possible suspect.  The witnesses to the Lonsdale shooting were shown the line ups and identified no one.

As Investigator Loeffler finished the Lonsdale interviews, he learned of a third shooting in Green Hills apartment complex.

## Green Hills Shooting
*December 18, 2015, at approximately 2:00 a.m.*

In the early morning hours of December 18, 2014, KPD Officer John Stevens conducted a "knock and talk" at Defendant Bassett's residence on Pleasant Knoll.  As Officer Stevens was attempting to make contact with the residents, two different cars drove down to the cul-de-sac, observed the officers, and immediately turned around and left the street.  One of the vehicles was an Acura, the other was a dark-colored BMW.  Officer Stevens observed an Impala and a Lexus, with the interior dome-light on, parked in front of the Pleasant Knoll residence.  Unable to make contact with any resident at the home, Officer Stevens returned to his vehicle and, within five minutes, he was dispatched to the Green Hills shooting scene.

When he arrived at the shooting scene, he saw a dark-colored BMW crashed into one of the apartment buildings near the entrance of the apartment complex.  The driver was slumped over the steering wheel and another man was standing over the driver with the driver's side door open.  Officer Stevens approached the vehicle and made contact with the man.  The driver was later identified as Mr. Perry.  Officer Stevens believed that the BMW was the same one he had earlier seen while at the Pleasant Knoll residence.  KPD Lieutenant Brian Malone led the man who was standing over Mr. Perry away from the crashed vehicle.

Lieutenant Malone, one of the first officers to arrive, assumed the role of scene commander, assisting other officers in securing the scene.  The crime scene was chaotic when he arrived with "people running all over the place, screaming and yelling."  Lieutenant Malone attempted to identify and retain any potential witnesses to the shooting.

One of the individuals Lieutenant Malone encountered was Defendant Williams.  The State played a video recording of their interaction.  On the recording, Defendant Williams cannot be seen, but he identifies himself by name.  The audio portion of the recording clearly conveys Defendant Williams's anguish over Mr. Perry's demise.  He expresses what appears to be genuine shock and explains to Lieutenant Malone that he was lying down inside the apartment and did not see the events that resulted in the BMW

11

crash. He refers to Mr. Perry as his brother and tells the officer that Mr. Perry's mother was shot earlier that night.

When KPD Sergeant Jonathan Chadwell arrived at the Green Hills shooting scene he saw a man, who later identified himself as Larry North, walking around agitatedly. Sergeant Chadwell observed Mr. North hit a garbage can twice before approaching him. Sergeant Chadwell moved Mr. North away from the crime scene to try to calm him. Sergeant Chadwell described Mr. North as upset and "very emotional." Mr. North disclosed that the man who was shot in the BMW was his cousin, Mr. Perry. He reported that he had heard gunfire, went outside his apartment, and saw the BMW had crashed into the building. Mr. North stated that the incident was gang-related and involved "the 400s." Defendant Bassett, who was visibly upset and emotional, was also present at the scene but would not speak with Sergeant Chadwell.

KPD Officer Vanessa Mayes interacted with Defendant Bassett as she approached the crime scene. Defendant Bassett asked her to retrieve his phone from inside the BMW. She told Defendant Bassett that she could not remove his phone from the crime scene at that time. Defendant Bassett appeared to calm down but then "started screaming and yelling again." Upon further questioning when Investigator Loeffler arrived, police learned that Defendant Bassett had been in the BMW, and Officer Mayes detained Defendant Bassett in her police cruiser.

Upon cross-examination by Defendant Bassett's attorney, Officer Mayes recalled that, during the drive to the police station, Defendant Bassett said that he had just seen his cousin shot and that there was blood "spurting out of his neck." She agreed that Defendant Bassett was "[v]isibly upset."

Crime scene technicians Ms. Taylor and Ms. Fine arrived at the Green Hills shooting crime scene at approximately 2:38 a.m. As they entered the apartment complex, they observed shell casings on the roadway. They proceeded to one of the apartment buildings where a black BMW had crashed into the building. Once a tow truck had pulled the BMW out of the building, Ms. Taylor observed three bullet defects on the vehicle and she described a great deal of blood inside the car. Law enforcement collected two black hoodies found "on the scene," one of the black hoodies had blood on the back of it. Ms. Fine identified the two black hoodies recovered at the Green Hills crime scene, noting that Mr. Perry was also wearing a black hoodie when he arrived at the hospital.

Upon arrival, Investigator Loeffler was aware that a shooting had occurred with the possibility of a homicide. As he walked toward the BMW that had impacted the apartment building, he observed Defendant Bassett speaking to Officer Mayes. Defendant Bassett wanted his phone from inside the crashed BMW. Upon realizing

Defendant Bassett had been in the car, Investigator Loeffler instructed officers to take Defendant Bassett to the police department for an interview. Investigator Loeffler also spoke with Mr. North who was transported to the police department for an interview.

Investigator Loeffler observed bullet defects on the BMW and that Mr. Perry had been shot at least once. There was a great deal of blood inside the car and extensive damage to the car. Law enforcement did not believe the shooting occurred where the car struck the apartment building, so officers began "backing up" to look for shell casings to determine the actual location of the shooting. KPD officers found shell casings near the entrance in a parking area just above where the car left the road, careened into a grassy area, and then struck the apartment building wall.

After returning to the police station, Investigator Loeffler interviewed Defendant Bassett and Mr. North. During his interview with Mr. North, he photographed text messages that occurred on December 17, 2015, beginning at 7:47 p.m., before the Lonsdale shooting, between Mr. North and Defendant Colbert. The text message indicated that Defendant Colbert was coming to Mr. North to retrieve a gun. The message was consistent with Mr. North's testimony about his interaction with the defendants prior to the Lonsdale shooting.

During Investigator Loeffler's interview with Defendant Bassett, Defendant Bassett initially claimed that he was not at Lonsdale and knew nothing about the shooting. As the men began to discuss the Dallas Street shooting of Mrs. Perry, Defendant Bassett said he was upset and angry about the shooting. He agreed that, instead of going to the hospital where Mrs. Perry was taken, he and Mr. Perry had driven from the Dallas Street residence to the Green Hills area. Despite his prior denial, Defendant Bassett admitted going to the Lonsdale Homes community. Defendant Bassett said that he and Mr. Perry went to the Lonsdale Homes area and saw some people on a back porch. Mr. Perry began firing his gun, and Defendant Bassett followed suit but fired his gun high, above the heads of the people on the porch. He said he fired a .40-caliber Glock and that Mr. Perry fired a .357 revolver.

The interview was video-recorded, and the State played the recording of the interview for the jury. During the interview, Defendant Bassett stated that the black BMW was his car that he allowed Mr. Perry to drive the night of the shootings. He described the Green Hills shooting, saying that he was looking at his phone, looked up, saw a gun, ducked his head, and the shooting began. When he next looked up, Mr. Perry was lying back against the seat, he saw blood, and then they crashed into the apartment building. Defendant Bassett crawled out through the back of the BMW and came around to the driver's side. He found Mr. Perry had been shot and saw blood "spurting out." Defendant Bassett removed his hoodie and applied pressure with the hoodie to Mr.

13

Perry's gunshot wound. He stated that he, Mr. Perry, and Kevin Early were inside the car at the time of the crash.

Investigator Loeffler also interviewed Defendant Williams. During the interview, he learned that Defendant Williams served for two and a half years in the Navy. Inside the BMW, police found a "Recruit" ball cap that had been signed by multiple people and a Navy hat. Defendant Williams denied being at Lonsdale at the time of the shooting but told Investigator Loeffler that he had been with Mr. Perry all day. When Defendant Williams learned of the Dallas Street shooting, he went to the Dallas Street residence with Defendant Bassett. Defendant Williams stated that after leaving Dallas Street, he spent the remainder of the day with Defendant Bassett and that they went to Green Hills.

Investigator Loeffler obtained and viewed surveillance video footage from the Green Hills apartment complex. The first clip was from December 17, 2015, at 8:10 p.m., after the Dallas Street shooting of Ms. Perry, and it was consistent with Mr. North's testimony. In the video, a black BMW arrived and four people exited the vehicle and walked into one of the apartment buildings. At 9:07 p.m., six men exited the apartment building, several of them wearing hoodies with the hoods up. Two of the men entered the black BMW, three entered the car parked next to the BMW, a Cadillac, and one man entered the vehicle parked on the other side of the Cadillac. All three vehicles left the parking lot at 9:09 p.m.

The next video clip is at 1:05 a.m. on December 18, 2015, after the Lonsdale shooting. The black BMW entered the parking lot and parked. Four men, dressed similarly, exited the black BMW and entered the apartment building. All four men had the hoods of their sweatshirts pulled up over their heads. Video footage from 1:50 a.m. showed five men exiting the apartment building. Three of them got inside the black BMW while two of the men walked to the other side of the parking lot. The BMW drove away from the parking lot. Approximately five minutes later, at 1:57 a.m., the BMW returned and crashed into the side of the building. In the video footage, two men can be seen exiting the BMW. One of the men ran inside the apartment building while the other man ran toward the apartment building door, then turned and ran toward the entrance of the apartment complex.

### Townview Towers – "North Shooting"
*April 2, 2016, approximately 3:00 a.m.*

KPD Officer Jacob Wilson was sitting in his office on April 2, 2016, with the window partially opened. As he worked, he heard several gunshots coming from the Townview Towers area, located across the street from the police department. Officer Wilson drove across the street and parked at the back entrance of an adjacent apartment

14

complex. He walked up the back staircase to the top "where Townview Towers is" and found Mr. North, who had been shot several times, lying on the ground. Officer Wilson spoke to residents in the area. One individual, who could not provide a name for the shooter, said that they saw a dark sedan leave the area.

KPD Crime Scene Technician Stephanie Housewright reported to Townview Towers and found Mr. North lying on the ground. She photographed and collected evidence. She identified photographs she took at the scene of the victim and numerous 9mm shell casings. She also collected a bullet fragment from UT Hospital where Mr. North's gunshot wounds were treated. Eight fired 9mm Luger caliber Winchester cartridge cases were recovered from the stairs.

Mr. North provided context for the April 2 shooting, referring back to the Green Hills shooting. He explained that, in the early morning hours of December 18, 2015, he heard gunfire and went outside to find the black BMW crashed into a building. Mr. Perry was in the driver's seat of the vehicle. Mr. North and Defendant Williams tried to "wake" Mr. Perry. When police arrived at the scene, they transported Mr. North to the police station where he provided a statement. Mr. North cooperated with the police because he wanted to know what had happened to Mr. Perry.

Following this incident, the defendants distanced themselves from Mr. North because they believed that Mr. North had "snitched" to the police. Mr. North contacted Defendant Colbert via Snapchat to try to clear up the misunderstanding. Several days later, he came in contact with Defendant Colbert and Defendant Williams at a New Year's party. The men spoke but with little resolution. The tension between them remained.

Mr. North again contacted Defendant Williams in April 2016, and Defendant Williams agreed to meet. At some point prior to the December 2015 shootings, Defendant Williams had stayed with Mr. North and left behind a military bag. Defendant Williams mentioned wanting various items from the bag on one or two occasions following December 17, 2015. On April 2, 2016, beginning at around 3:00 p.m., the two men began texting one another and continued to exchange text messages throughout the afternoon and into the night. At some point during the text message exchange, Defendant Williams indicated that he wanted to retrieve his bag from Mr. North.

As it neared midnight, Defendant Williams asked where they should meet, and Mr. North responded that Defendant Williams should come to the apartment. Defendant Williams indicated that the driver of the vehicle he was riding in was in a hurry and asked Mr. North to meet him "by the steps" with the bag. Mr. North sent a text message, instructing Defendant Williams to meet him in the courtyard in the middle of the

15

apartment complex. Defendant Williams insisted Mr. North meet him at the steps and eventually Mr. North agreed, taking his young nephew with him. As he approached the steps, he saw Defendant Williams pull a gun out from his hoodie and begin firing at Mr. North. The bullets struck Mr. North one time in his arm and seven times in his legs. Mr. North said he had not communicated with Defendant Williams since that incident.

Between the December 2015 Lonsdale shooting and the April 2016 North shooting, additional forensic evidence related to the guns used at the Lonsdale shooting was recovered. KPD Officer Andrew Markham stopped a white Nissan Maxima in the Lonsdale area near Badgett Drive on January 17, 2016; Defendant Williams was in the front passenger seat. When Officer Markham approached the vehicle, he smelled the odor of marijuana coming from inside the Maxima. Officer Markham removed the occupants from the vehicle and, as a result of a K-9 search of the Maxima, law enforcement found a loaded .40 caliber Smith and Wesson handgun underneath the front passenger seat. Fourteen rounds/bullets were removed from the handgun. The Maxima was not registered to Defendant Williams, and law enforcement did not know how long the gun had been under the front passenger seat.

KPD Firearms Examiner Patricia Resig test-fired the .40 caliber semiautomatic pistol recovered during the January 17, 2016 traffic stop and concluded that it was the same gun that had fired all eleven casings at the Lonsdale shooting, including the bullet recovered from Zaevion Dobson's body, and the bullet found in the upstairs Badgett residence bedroom.

Within days of the North shooting, on April 4, 2016, Officer Wilson conducted a stop of a green Honda Civic ("Honda") that Defendant Colbert was believed to be in. The Honda was first identified parked on Badgett Drive inside the Lonsdale Homes community. Before Officer Wilson could arrive, the Honda began traveling toward I-275 south where Officer Wilson attempted to initiate a traffic stop of the vehicle. The driver of the Honda did not pull over and led police on a chase through Knoxville and into East Knoxville where the occupants exited the Honda in the Morningside community and fled into Morningside Park. Defendant Williams and Darryl Sligh were apprehended at the scene, and Defendant Colbert turned himself in approximately forty-five minutes later at the police department. Several cell phones and a loaded .357 Magnum revolver were recovered in the park from the area along their flight path. Officer Wilson did not see who specifically disposed of the gun, but he witnessed all three men "throwing items" as they fled. Officer Wilson later learned that Defendant Williams was the driver of the Honda.

KPD Officer Jacob Schettler assisted in the vehicle pursuit. He pursued Defendant Williams on foot into Morningside Park and apprehended him. He performed

16

a pat down of his person and found a red bandana in his right front pant pocket. Inside the bandana were eight or nine 9mm rounds. Defendant Williams initially told Officer Schettler that his name was Riley Rose and provided a fake birth date. Defendant Williams's father was at the scene, however, and identified Defendant Williams for the police.

City of Knoxville employee Lucas McBee was mowing at Morningside Park on April 14, 2016, when he found a 9mm Luger pistol lying on the ground. According to Mr. McBee, the park area was mowed every two weeks. Mr. McBee immediately notified his supervisor and the police. KPD Officer Jason Boston responded to the call about the gun and met the foreman of the crew who directed him to the firearm. He picked up the firearm and carried it to his police cruiser for safety purposes.

KPD Firearms Examiner Resig test-fired the 9mm handgun recovered in Morningside Park and concluded that it was the same gun that had fired the eleven casings recovered at the Lonsdale shooting in December 2015, and that it was also the same gun used to shoot Mr. North in April 2016.

Knox County Sheriff's Office Investigator Thomas Walker was qualified as an expert in the field of gang investigation. He summarized the history of gangs in Knoxville for the jury and explained the division of gang territory between the East (Bloods) and the West (Crips). He reviewed gang graffiti photographed at and near the Dallas Street residence that displayed graffiti identifying with the Bloods gang. He also reviewed the "Double O" video by the L.I.E. gang that the State had earlier introduced through Mr. North. Mr. North had testified that the defendants recorded songs together at an apartment complex in East Knoxville and made music videos after recording a song. In the still photograph from the video, Mr. North identified each of the defendants in the rap video.

The State played the video for the jury and Investigator Walker identified gang colors, symbols, and references within the song that indicated an association with the Bloods gang. The lyrics of the song referenced sets of the Crip street gang present in Knoxville and used Bloods gang terminology. Investigator Walker also reviewed the December 17, 2015 text messages between Defendant Colbert and Mr. North, identifying specific language in the text messages that indicated Blood gang affiliation. As part of his job, Lieutenant Walker maintained a list of persons identified as gang members in Knox County. As of the time of trial, the list contained 1,466 people. None of the defendants were included on this list of individuals.

Lieutenant Walker explained that in the early 90s there was a fairly stable geographical dividing line between East and West gangs. However, the housing in

Knoxville had since changed with the KCDC moving housing projects. He explained that College Homes was torn down and Western Heights, with over 5,000 units at one time, had now been reduced to 1200 units. This caused residents to be redistributed to various areas around Knoxville and spread the gangs out, diluting the geographical dividing line.

Following the State's case-in-chief, Defendant Bassett presented Erik Nielson, with no objection from the State, as an expert witness in the field of rap music. Dr. Nielson described the history of the "murder ballad," lyrics that are often violent and include the theme of murder, identifying this type of ballad in varied styles of music, including country music, opera, hard core punk, and folk music. He explained that rap music is a part of the hip-hop culture, but one of many different types of hip-hop expression. He then recounted the history of the hip-hop culture, which began in the South Bronx during the early to mid-seventies when gang activity in this area was prevalent. Dr. Nielson stated that "the explicit purpose of hip-hop was to take a lot of that aggression and territoriality and competitiveness inherent to gang life and to channel it into something artistic and productive." He explained that this gang history was influential in rap music "because that's really the sort of - - that's where it all started, in some senses."

Dr. Nielson distinguished between "real gangsters" and "studio gangsters," explaining that the latter are musicians. These musicians put on a "persona" as part of an art form but that the gang persona is not reflective of their real life. Dr. Nielson opined that for young, aspiring "artists" to gain success in the rap industry, the expectation "has long been that they adopt sort of gangster or thug persona in their lyrics." He stated that record executives are not interested in "more socially-conscious, politically-motivated stuff." Thus, aspiring rappers must "demonstrate [a] proficiency in that particular type of rap music." He identified "hyper violent," "misogynistic," "hypersexual," and glorifying "illicit activity, drug dealing, drug use" as "stock conventions of this type of rap music."

Dr. Nielson viewed the "Double O" video by the L.I.E. Gang. He distinguished between the "beats" and the language of a song, saying the "beats" was the musical aspect and the language was the lyrics "you may lay on top of it." About the "Double O" song, Dr. Nielson noticed that the beats were developed by Chicago artist Edai in his song titled "Six Double O." In addition to the same music, many of the "Double O" lyrics were also repeated from "Six Double O." He described the "Double O" song as a "knockoff."

About the L.I.E. Gang video, Dr. Nielson stated, "[T]hey are imitating the Chicago drill style. They are imitating [Edai]. They are imitating this song ["Six Double O"], not only in the title, but all the way down to specific themes and specific lyric choices all the

18

way through." He noted common themes in the two songs such as "projecting strength in the face of violence," "defending your turf," with themes of disrespect and retaliation which he described as "standard fare" in gangster rap music.

Dr. Nielson testified that distribution of music through YouTube was a common strategy for aspiring rappers. He explained that aspiring rappers would use social media sites to attract a strong local fan base and then build on that fan base to develop national attention and hopefully a music contract. The L.I.E. Gang "Double O" song was published on May 12, 2015.

Dr. Nielson identified a Twitter account associated with the L.I.E. Gang that he used to formulate his opinion relative to the rap component of L.I.E. Gang's music. The account was created in December 2013 and identified the group as "up and coming rap artists" and provided contact information for collaboration and for booking. Dr. Nielson also reviewed Defendant Bassett's Twitter account. The group was attempting to promote their music by distributing it as widely as possible such as on YouTube. He said the group released four videos on YouTube and "multiple mixed tapes" to Datpiff, consisting of approximately thirty songs. He described the group as employing fairly extensive use of social media to promote their careers and disseminate their music. In listening to the other songs released, Dr. Nielson opined that the other songs were "fairly different in tone" than that of "Double O." The lyrics of the other songs focused more on smoking marijuana, drinking codeine, sex and any references to retaliation were very generalized. In his opinion, "Double O" stood out as being fairly different from the group's overall body of work.

In his review of all of the L.I.E. Gang music, he found that they appeared to be experimenting with different subgenres, which he stated was expected from an aspiring group of artists. The State objected to Defendant Bassett's attorney asking Dr. Nielson about the "positive aspects of rap," and the trial court sustained the objection based on relevance. Next, Defendant Bassett's attorney attempted to ask about the group's commercial intent, and the trial court sustained the objection finding that the questioning was repetitive.

Dr. Nielson testified that he considered "Double O" "to be an imitation of a similar song by a much more well-known and successful artist in an attempt to find a style that works that this group could - - could turn into something for themselves."

On cross-examination, Dr. Nielson testified that "traditionally" the west side of Knoxville had been Crip territory while the east side of Knoxville was Blood territory. Like many cities nationwide, the borders have started to disappear to some degree leaving

19

"feuding over much smaller areas of territory." He agreed that the L.I.E. Gang used the term "gang" in their name, however, he asserted that "[m]any" rap groups do.

On redirect, Dr. Nielson noted that many of the lyrics Defendant Bassett delivered were appropriated lyrics from Chicago artists and some southeastern rappers

Following Defendant Bassett's proof, Defendant Williams and Defendant Colbert declined to offer any roof.

After hearing this evidence, the jury convicted Defendant Bassett of two counts of unlawful possession of a firearm, one count of first-degree murder, five counts of attempted first-degree murder, three counts of attempted second degree murder, eight counts of employing a firearm during the commission of a dangerous felony, and eight counts of employing a firearm during the commission of a dangerous felony having been convicted of a drug offense. The jury convicted Defendant Williams and Defendant Colbert of one count of facilitation of first degree murder, five counts of facilitation of attempted first degree murder, three counts of facilitation of attempted second degree murder, and eight counts of facilitation of employing a firearm during the commission of a dangerous felony. For these convictions, Defendant Bassett received a life sentence plus thirty-five years and Defendant Williams and Defendant Colbert each received an effective sentence of 107 years in the Tennessee Department of Correction. It is from these judgments that the defendants now appeal.

## II. Analysis

On appeal, Defendant Bassett asserts that the trial court improperly denied the motion to suppress his December 18, 2015 statement to the police. Defendant Williams appeals the trial court's admission of the North Shooting because this evidence was improper propensity evidence and unfairly prejudicial. Additionally, he claims cumulative error. All three defendants appeal the trial court's admission of their YouTube rap video, asserting that the admission violated their First Amendment rights, was irrelevant, and unfairly prejudicial. Finally, Defendant Williams and Defendant Colbert challenge the sufficiency of the evidence supporting their convictions.

### A. Defendant Bassett's Motion to Suppress

Defendant Bassett contends that the trial court erred when it denied his motion to suppress his statement to Investigator Loeffler. He contends that the police used coercive tactics during his interview, while he was "particularly vulnerable and fragile" due to witnessing Mr. Perry's death. The State responds that the video recording of the interview belies the assertion that Defendant Bassett was coerced. The State further notes

that Defendant Bassett incriminated himself after hearing about the scientific testing the State would employ during the investigation, and not in response to any claimed coercion. We agree with the State.

Our standard of review for a trial court's findings of fact and conclusions of law on a motion to suppress evidence is set forth in *State v. Odom*, 928 S.W.2d 18 (Tenn. 1996). Under this standard, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *Id*. at 23. As is customary, "the prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)). Nevertheless, this court reviews *de novo* the trial court's application of the law to the facts, without according any presumption of correctness to those conclusions. *See State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001); *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn. 1999). The trial court, as the trier of fact, is able to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence, and resolve any conflicts in the evidence. *Odom*, 928 S.W.2d at 23. In reviewing a trial court's ruling on a motion to suppress, an appellate court may consider the evidence presented both at the suppression hearing and at the subsequent trial. *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998).

We have already summarized the trial evidence and now briefly summarize the evidence from the motion to suppress hearing. At that hearing, the State introduced evidence of Defendant Bassett's prior experience with the criminal system, which included: (1) a May 2, 2014 citation for possession of marijuana; (2) a May 30, 2014 vehicle stop that resulted in convictions for theft and unlawful possession of a weapon; and (3) a September 16, 2014 arrest for marijuana possession, vandalism, and criminal impersonation, during which Defendant Bassett refused to waive his *Miranda* rights and speak with the police. The State entered certified copies of the convictions for each of these offenses.

The State then presented the following evidence: KPD Officer Mayes encountered Defendant Bassett at the Green Hills shooting crime scene. She described him as "really, really upset," "screaming," and attempting to enter the crime scene. She recalled that Defendant Bassett wanted to retrieve his phone from the black BMW. She overheard him telling someone else not to speak to the police because the police "were trying to figure what happened."

At Investigator Loeffler's request, she transported Defendant Bassett to the police department. Once inside her police car, the Defendant was calmer and less "confrontational." She arrived at KPD at approximately 2:52 a.m. and escorted

Defendant Bassett, who was not handcuffed, inside. She did not detect any odor of alcohol on Defendant Bassett, and, during her interactions with him, he did not appear to be intoxicated.

Investigator Loeffler first encountered Defendant Bassett at the Green Hills shooting crime scene. Defendant Bassett was very loud, cursing, and not cooperative with police orders. After speaking with Defendant Bassett briefly, Investigator Loeffler determined that he needed to interview Defendant Bassett because Defendant Bassett admitted that he had been in the BMW when it crashed. A police officer transported Defendant Bassett to the police department at around 2:30 a.m. while Investigator Loeffler finished his investigation of the scene.

When Investigator Loeffler returned to KPD, he interviewed several individuals before he interviewed Defendant Bassett. While waiting, Defendant Bassett was offered water and given the opportunity for bathroom breaks. Investigator Loeffler initiated the recorded interview with Defendant Bassett at around 5:30 a.m. During this interaction, Defendant Bassett was "[m]uch calmer, coherent, understood the questions, [and was] able to answer the questions." Investigator Loeffler did not smell any odor of alcohol on Defendant Bassett's breath. Investigator Loeffler's practice was to assess an individual before questioning to determine if they might be impaired. In Investigator Loeffler's opinion, Defendant Bassett did not appear to be impaired "in any way whatsoever."

Investigator Loeffler entered the room, introduced himself to Defendant Bassett and then offered him a drink and the use of a bathroom. He then reviewed Defendant Bassett's rights with him, asking Defendant Bassett to initial each of the rights to indicate he understood each right after reading it. Defendant Bassett indicated his desire to speak with Investigator Loeffler before signing and dating the bottom of the Rights Waiver. After Defendant Bassett signed the waiver, Investigator Loeffler commenced the interview. Defendant Bassett did not at any point in the interview request an attorney or state he wished to stop the interview.

During the interview, Investigator Loeffler referenced text messages and surveillance video footage that he had not yet received as if he had them in his possession. At the suppression hearing, Investigator Loeffler denied placing any pressure on Defendant Bassett or attempting to place enough stress on Defendant Bassett to cause him to "break." Investigator Loeffler denied being the first to mention Defendant Williams and Defendant Colbert during the interview, maintaining that Defendant Bassett first referred to the codefendants. Investigator Loeffler agreed that he used "minimization" as a tactic during interviews.

Investigator Loeffler did not observe any visible injuries to Defendant Bassett. He was unaware of any injuries until Defendant Bassett referenced a previous injury to his hand that occurred when he "and his buddies were fooling around."

After hearing this evidence, the trial court took the matter under advisement and later issued a detailed order denying Defendant Bassett's motion to suppress. In the written order, the trial court made the following findings:

Concerning [Defendant Bassett's] demeanor and appearance, the court finds that [Defendant Bassett] seemed completely coherent and demonstrated reasonable emotions that appeared under control. . . . The video shows no evidence that [Defendant Bassett] was impaired in any other way. [Defendant Bassett] did not complain of any injuries other than a hand injury that had occurred sometime before these events. He did show signs of emotional pain and turmoil from what he had witnessed earlier in the evening. He referred several times to just witnessing [Brandon Perry] get shot in the neck while seated right next to him. He cried at several points during the interview process when discussing Mr. Perry. The investigator did not tell [Defendant Bassett] that Mr. Perry had died until he was ready to conclude the interview. At that point, [Defendant Bassett] stopped the investigator from leaving the room and wanted to continue to speak with him. At no point during the question and answer part of the interview did [Defendant Bassett] appear overcome by his emotions. His emotions seemed appropriate to the situation.

Although [Defendant Bassett] was awake throughout the early morning hours of the investigation, he did not seem overly fatigued during the interview. Toward the end of the interview process, he opened the door to the interview room and asked to use the bathroom. He was then allowed to use the restroom and returned with a bottle of water. At no other time during the recording did [Defendant Bassett] ask to use the restroom or for food or drink.

For the most part, the interview was very cordial with the investigator taking the approach that he was trying to find out what happened and to help [Defendant Bassett]. The interview discussed all three shootings that occurred that evening. The shooting of Mr. Perry, where [Defendant Bassett] may have also been a victim, was discussed almost as much as the shooting where [Defendant Bassett] was a suspect. There were several incidents where the investigator raised his voice and said that [Defendant Bassett] was "going to get [himself] in trouble" by not

23

telling the investigator what he wanted to hear. However, this tact appeared to be ineffectual. [Defendant Bassett] did not change his answers when this approach was taken. [Defendant Bassett] would argue back and say he was telling him the truth. The court finds that the investigator did not overbear [Defendant Bassett's] will by confronting [Defendant Bassett] with the belief that he was lying. [Defendant Bassett] maintained his position during these confrontations.

[Defendant Bassett's] biggest concern was his desire to go home and be with his kids. When he asked Investigator Loeffler if he would be going home, the investigator said he didn't know yet. He never made any promises to [Defendant Bassett] on whether he would get to go home, although he did say at one point that there were currently no warrants on [Defendant Bassett] and that he would be able to go home as things currently stood. However, [Defendant Bassett] expressed several times the belief that he knew he would be going to jail. Investigator Loeffler did suggest answers to his own questions several times. For instance, when he was asking [Defendant Bassett] if he shot a gun, he suggested that maybe [Defendant Bassett] just shot into the air. Sometimes [Defendant Bassett] would adopt the proposed facts, but, not always. Looking at the statement as a whole, the court finds many more instances where [Defendant Bassett] denied what the investigator was suggesting than when he agreed with the investigator. [Defendant Bassett] would frequently maintain that he had no knowledge about a fact until the investigator told him that he had a video or a witness that said otherwise. [Defendant Bassett] would then admit to the fact but in a light most favorable to [Defendant Bassett]. There were several facts that [Defendant Bassett] would offer freely. For instance, he said he believed that Mr. Perry's girl set him up. There were also several other facts that the investigator confronted [Defendant Bassett] with that [Defendant Bassett] maintained his denial. [Defendant Bassett] seemed in complete control of what he was saying throughout the interview.

The truly incriminating statements by [Defendant Bassett] came primarily after being told a second time that a gun-shot residue test would be conducted on him. At that point he had already said that Mr. Perry had a revolver and he knew that there were many shell casings found at the scene. He then admitted that he had a .40 caliber Glock and that he fired in the air. A telling statement was made by [Defendant Bassett] that was completely unsolicited by the investigator. He stated at one point during the interview that, "[I ain't seen nobody get shot. I ain't shot nobody. `til today. I just seen that my cousin got shot in his neck."] [Defendant Bassett] was calm

24

during this statement and it was not connected to any question or statement by the investigator. He appeared to be expressing his honest thoughts and emotions.

. . . .

[At the suppression hearing] Investigator Loeffler did state that he lied to [Defendant Bassett] about having videos of the shooting and that he didn't know if Mr. Perry was alive. However, the video of the interview makes it clear that [Defendant Bassett] did not provide any incriminating responses based upon these statements by the investigator. It was only after being confronted with a gun-shot residue test and the number of shell casings at the scene that [Defendant Bassett] admitted to shooting a gun. He continued to deny having a gun well after being told the police had a video of the shooting. This misrepresentation by the investigator had little impact on [Defendant Bassett]'s statement and certainly did not overbear his will.

The decision to not reveal to [Defendant Bassett] at the beginning of the interview that Mr. Perry had died likely assisted in the voluntariness of the statement. It was obvious that the news of Mr. Perry's death was upsetting to [Defendant Bassett]. Investigator Loeffler did not use this death as leverage to get [Defendant Bassett] to talk. He tried to end the interview when he revealed Mr. Perry's death to give [Defendant Bassett] some time to deal with his loss. However, [Defendant Bassett] stopped him and reinitiated the discussion. Prior to learning that Mr. Perry was dead, [Defendant Bassett] was obviously concerned for his cousin's well-being. However, he did not appear to the court to be overcome with anxiety. He was able to speak freely and listen attentively to the questions. Although he did cry at times during the interview, his emotions remained under control and appropriate to the situation. Thus, the court does not find that the investigator's deceptions in anyway caused [Defendant Bassett] to give an involuntary statement.

Considering both the evidence presented at the suppression hearing and the evidence presented at trial, we now consider the voluntariness of Defendant Bassett's statements to Investigator Loeffler. "Confessions that are involuntary, i.e., the product of coercion, whether it be physical or psychological, are not admissible." *State v. Phillips*, 30 S.W.3d 372, 376 (Tenn. Crim. App. 2000) (citing *Rogers v. Richmond*, 365 U.S. 534, 540 (1961)). In order to make the determination of whether a confession was voluntary,

the particular circumstances of each case must be examined. *Id*. at 377 (citing *Monts v. State*, 400 S.W.2d 722, 733 (1966)). "Coercive police activity is a necessary prerequisite in order to find a confession involuntary." *Id*. (citing *State v. Brimmer*, 876 S.W.2d 75, 79 (Tenn. 1994)). "The crucial question is whether the behavior of the state's officials was 'such as to overbear [defendant's] will to resist and bring about confessions not freely self-determined.'" *Id*. (quoting *Rogers*, 365 U.S. at 544); *see State v. Kelly*, 603 S.W.2d 726, 728 (Tenn. 1980). "Advice to an individual concerning the consequences of a refusal to cooperate is not objectionable." *State v. Smith*, 933 S.W.2d 450, 456 (Tenn. 1996).

> The relevant factors in determining the voluntariness of a confession are: [T]he age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured[,] intoxicated[,] or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep [,] or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

*State v. Climer*, 400 S.W.3d 537, 568 (Tenn. 2013) (quoting *State v. Readus*, 764 S.W.2d 770, 790 (Tenn. Crim. App. 1988). No single factor is necessarily determinative. *State v. Blackstock*, 19 S.W.3d 200, 208 (Tenn. 2000).

The evidence in the record does not preponderate against the trial court's findings about Defendant Bassett's confession. Defendant Bassett was an adult at the time of the interrogation and demonstrated a level of sophistication and intelligence. The State provided evidence that Defendant Bassett had experience with the criminal system and, specifically, his right to refuse to speak with the police. Defendant Bassett had received the benefit of the *Miranda* warnings, was interviewed for approximately an hour and a half to two hours, and was not extensively interrogated or mistreated in any way. Defendant Bassett was offered breaks and responded affirmatively about his willingness to speak with Investigator Loeffler. The investigator read the waiver statement to Defendant Bassett and said, "If you want to talk to me about what is going on, you need to sign right there." Defendant Bassett signed his name and said, "I'm not going to lie to you. I'll tell you everything I know." There is no indication that he was not in full control of his emotions and reasoning powers.

26

While Investigator Loeffler repeatedly encouraged Defendant Bassett to tell the truth, we do not find that the investigator misrepresented potential punishment to Defendant Bassett or made promises to him. We agree with the trial court that to the extent that Investigator Loeffler misrepresented his possession of the surveillance video and withheld information regarding Mr. Perry's death, these deceptions were not of such a degree that that they overpowered Defendant Bassett's will.

Accordingly, the record supports the conclusion that Defendant Bassett's statement was voluntary and not the product of police coercion. Defendant Bassett is not entitled to relief as to this issue.

## B. Admission of Evidence of the April 2016 Shooting of Mr. North

Defendant Williams argues that the trial court erred in admitting evidence of his role in the April 2016 shooting of Mr. North, months after the victim's murder. He asserts that this evidence was both irrelevant and unfairly prejudicial. The State responds that the evidence was relevant for the purposes of motive and identity. We agree with the State.

Generally, "[a]dmission of evidence is entrusted to the sound discretion of the trial court, and a trial court's ruling on evidence will be disturbed only upon a clear showing of abuse of discretion." *State v. Robinson*, 146 S.W.3d 469, 490 (Tenn. 2004). The Tennessee Rules of Evidence provide that all "relevant evidence is admissible," unless excluded by other evidentiary rules or applicable authority. Tenn. R. Evid. 402. Of course, "[e]vidence which is not relevant is not admissible." *Id*. Relevant evidence is defined as evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Even relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

"Evidence of other crimes, wrongs, or bad acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). Such evidence may be admissible, however, for "other purposes." *Id*. Our Tennessee Supreme Court has determined that such "other purposes" include demonstrating motive, identity, or intent. *State v. Berry*, 141 S.W.3d 549, 582 (Tenn. 2004). Such evidence is admissible for other purposes, provided that the trial court: (1) upon request, holds a hearing outside the jury's presence; (2) determines that a material issue exists other than conduct conforming with a character trait and, upon request, states the basis for its determination; (3) finds proof of the other crime, wrong, or act to be clear

and convincing; and (4) determines that the probative value of the evidence is not outweighed by the danger of unfair prejudice. Tenn. R. Evid. 404(b). The safeguards in Rule 404(b) ensure that defendants are not convicted for charged offenses based on evidence of prior crimes, wrongs, or acts. *State v. James*, 81 S.W.3d 751, 758 (Tenn. 2002). When a trial court substantially complies with the procedural requirements of Rule 404(b), the standard of appellate review of the trial court's decision is abuse of discretion. *See State v. Powers*, 101 S.W.3d 383, 395 (Tenn. 2003); *James*, 81 S.W.3d at 759. If the strict requirements of the rule are not substantially observed, the reviewing court gives the trial court's decision no deference. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997).

The trial court admitted evidence related to the April 2016 shooting of Mr. North for purposes of identity as it related to the December 2015 Lonsdale shooters. Forensic evidence established that Mr. North was shot with a 9mm pistol. This 9mm pistol was the same pistol recovered from Morningside Park days after Defendant Williams had discarded items from his person while fleeing the police. The pistol Defendant Williams used to shoot Mr. North also fired eleven of the 9mm shell casings recovered at the Lonsdale shooting scene. Additionally, Mr. North spoke with the police following the Lonsdale shooting. According to Mr. North, this created hostility between Mr. North and the defendants, who believed Mr. North may have provided incriminating evidence to the police. This hostility ultimately led to the April 2016 shooting of Mr. North.

This evidence was relevant to establish Defendant Williams's identity as one of the Lonsdale shooters. The identity of the perpetrator is an essential element of any crime, and therefore the State is tasked with proving identity beyond a reasonable doubt. *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citing *State v. Thompson*, 519 S.W.2d 789, 793 (Tenn. 1975). In this respect, evidence of the April 2016 shooting had high probative value. The source of Defendant Williams's animosity toward Mr. North related to Mr. North's cooperation with the police during the Lonsdale shooting investigation. Moreover, the trial court instructed the jury that they were not to consider evidence of the April 2016 North shooting for anything other than motive and identity, thereby limiting the danger of unfair prejudice. The jury is presumed to follow the court's instructions. *State v. Shaw*, 37 S.W.3d 900, 904 (Tenn. 2001).

Accordingly, we conclude that the trial court properly admitted the evidence for the legitimate non-propensity purposes of identity and motive. Defendant Williams is not entitled to relief on this issue.

### C. Admission of Rap Video

All of the defendants challenge the trial court's admission of the rap video, "Double O", claiming that the admission of the video was a violation of their First Amendment rights and that any probative value was outweighed by the prejudicial effect.

The First Amendment to the United States Constitution provides that:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

The protection of free speech has been characterized in First Amendment jurisprudence as a "fundamental" liberty. "Of that freedom one may say that it is the matrix, the indispensable condition, of nearly every other form of freedom." *Palko v. Connecticut*, 302 U.S. 319, 327 (1937). The First Amendment contemplates that "the ultimate good desired is better reached by free trade in ideas - that the best test of truth is the power of the thought to get itself accepted in the competition of the market. . . ." *Abrams v. United States,* 250 U.S. 616, 630 (1919) (Holmes, J., dissenting). The choices that government may make in an effort to regulate or prohibit speech are limited. *See Consolidated Edison Co. of New York, Inc. v. Public Service Comm'n of New York*, 447 U.S. 530, 538 (1980) ( "[G]overnments must not be allowed to choose which issues are worth discussing or debating."). Our country's history is replete with examples of the power of free speech to bring about positive change when even the least powerful among us are afforded the right to place ideas, often unpopular ideas, out in the marketplace.

The First Amendment, however, does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent. Evidence of a defendant's previous declarations or statements is commonly admitted in criminal trials subject to evidentiary rules dealing with relevancy, reliability, and the like. *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993). In *Wisconsin v. Mitchell*, the Supreme Court explained its reasoning as follows:

Nearly half a century ago, in *Haupt v. United States*, 330 U.S. 631 (1947), we rejected a contention similar to that advanced by Mitchell here. Haupt was tried for the offense of treason, which, as defined by the Constitution (Art. III, § 3), may depend very much on proof of motive. To prove that the acts in question were committed out of "adherence to the enemy" rather than "parental solicitude," the Government introduced evidence of conversations that had taken place long prior to the indictment, some of which consisted of statements showing Haupt's sympathy with Germany and Hitler and hostility towards the United States. We rejected

29

Haupt's argument that this evidence was improperly admitted. While "[s]uch testimony is to be scrutinized with care to be certain the statements are not expressions of mere lawful and permissible difference of opinion with our own government or quite proper appreciation of the land of birth," we held that "these statements . . . clearly were admissible on the question of intent and adherence to the enemy." *Id.*, at 642. *See also Price Waterhouse v. Hopkins*, 490 U.S. 228, 251-252 (1989) (plurality opinion) (allowing evidentiary use of defendant's speech in evaluating Title VII discrimination claim); *Street v. New York*, 394 U.S. 576, 594 (1969).

The defendants rely heavily on a United States Supreme Court opinion, *Dawson v. Delaware*, 503 U.S. 159 (1992), in arguing that the introduction of the rap video was a violation of their First Amendment rights. In *Dawson v. Delaware*, the Supreme Court held that it is proper for a capital sentencing jury to consider evidence of the defendant's racial intolerance and subversive advocacy where such evidence is relevant to the issues before the jury. *Dawson v. Delaware*, 503 U.S. at 164-65. The particular evidence in that case, however, Dawson's membership in the Aryan Brotherhood, was unaccompanied by any showing Dawson's capital offense was racially motivated or endorsed by the Aryan Brotherhood and was not relevant to rebut any mitigating evidence proffered by the defense. Therefore, the Supreme Court concluded the evidence was irrelevant to any issue before the sentencing jury. *Id.* at 166-67. The Supreme Court explained in *Dawson* that the Constitution does not erect a *per se* barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and associations are protected by the Constitution. *Id.* at 165. The Supreme Court identified the constitutional flaw in the prosecution's reliance on Dawson's membership in the Aryan Brotherhood as the failure to introduce other evidence tying Dawson's membership to any of the considerations before the sentencing jury. *Id.* at 166-67.

In contrast to the circumstances of *Dawson*, evidence of the defendants' association with the Bloods gang was combined with testimony from a veteran police officer, familiar with gang activities at the time the defendants created the video purporting gang affiliation, that established the Bloods and the Crips were rival gangs in Knoxville. Witnesses at the Lonsdale shooting scene also testified about the territorial rivals, indicating that Lonsdale was Crip territory and the State showed a pattern of back and forth shootings that occurred on the night of December 17, 2015, supporting their theory of gang retaliation. Under such circumstances, the constitutional defect found in *Dawson* was absent from the defendants' trial.

The defendants also challenge admission of the video as irrelevant and unfairly prejudicial. Generally, the admission of evidence at trial is entrusted to the broad discretion of the trial court, and as such, a trial court's ruling on the admission of

evidence may only be disturbed upon a showing of an abuse of discretion. *State v. Robinson*, 146 S.W.3d 469, 490 (Tenn. 2004) (citing *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997)). The trial court's exercise of discretion may not be reversed unless the court "applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997).

Under Tennessee Rule of Evidence 401, "relevant evidence" is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Tenn. R. Evid. 401. Rule 403 prohibits, however, the introduction of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. In determining the admissibility of evidence, "the trial court must consider, among other things, the questions of fact that the jury will have to consider in determining the accused's guilt as well as other evidence that has been introduced during the course of the trial." *State v. Williamson*, 919 S.W.2d 69, 78 (Tenn. Crim. App. 1995).

Tennessee Rule of Evidence 404(b) provides that evidence of other wrongs or bad acts is "not admissible to prove the character of a person in order to show action in conformity with the character trait." However, Rule 404(b) only applies to acts which reflect upon the character of the criminal accused. *See State v. Stevens*, 78 S.W.3d 817, 837 (Tenn. 2002). Such evidence may be allowed "for other purposes" if the following conditions are met prior to admission of this type of proof:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and

(3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). "Other purposes" has been defined to include: (1) motive; (2) intent; (3) guilty knowledge; (4) identity of the defendant; (5) absence of mistake or accident; (6) a common scheme or plan; (7) completion of the story; (8) opportunity; and (9) preparation. *State v. Parton*, 694 S.W.2d 299, 302 (Tenn. 1985); *Bunch v. State*, 605 S.W.2d 227, 229 (Tenn.1980); *State v. Jones*, 15 S.W.3d 880, 894 (Tenn. Crim. App.

1999). This court has held that "evidence concerning gang affiliation is character evidence subject to Rule 404(b)." *State v. Orlando Crayton*, No. W2000-00213-CCA-R3-CD, 2001 WL 720612, at *3 (Tenn. Crim. App., June 27, 2001), *no perm. app. filed*; *see also State v. Ronald Eugene Brewer, Jr.*, No. E2010-01147-CCA-R3-CD, 2011 WL 2732566 (Tenn. Crim. App. July 14, 2011), *perm. app. denied* (Tenn. Sept. 21, 2011) (Material related to gangs and gang-related activity properly admitted because the State's theory was that the "rival gang affiliations provided the motive for the shooting".).

In this case, the trial court substantially complied with the requirements of Tennessee Rule of Evidence 404(b) and properly found that the evidence was admissible as to the defendants' motive for committing the offenses and intent in committing the offenses. It is also relevant to Mr. Patrick's identification of Defendant Colbert as one of the men present in Lonsdale Homes shortly before the shooting. There is evidence in the record that the offenses were gang-related, including testimony that the Bloods and the Crips were rival gangs. The rap lyrics and video that the defendants participated in and circulated on the internet referenced the gang territory divide in Knoxville, the defendants' identification with the Blood gang, their dislike of the Crips, and their desire to harm members of the rival gang. The jury also heard Defendant Bassett's expert witness testify about gangster rap and how rap artists often create a persona that involves gang affiliation that is not reflective of their real life.

We conclude that the trial court did not abuse its discretion when it allowed the gang-related rap lyrics and video to be introduced into evidence. The State's theory at trial was that the rival gang affiliations of the Crips and Bloods provided the motive for the victim's murder and the attempted murders of the others present on the Badgett residence porch. The "Double O" video also provided the basis for Mr. Patrick's identification of Defendant Colbert on the night of the shooting. Moreover, we agree with the trial court's findings that the probative value of the evidence was not outweighed by the danger of unfair prejudice. The defendants are not entitled to relief on this issue.

## D. Sufficiency of the Evidence

Defendant Williams and Defendant Colbert challenge the sufficiency of the evidence supporting their convictions for facilitation of: first degree murder, attempted first-degree murder, attempted second degree murder and employment of a firearm during the commission of a dangerous felony. Specifically, both defendants argue that the State failed to prove their identities as the perpetrators of these crimes or that they furnished the "substantial assistance" necessary to prove facilitation. The State responds that there was sufficient evidence upon which the jury could reasonably convict

Defendant Williams and Defendant Colbert of facilitating the various felonies. We agree with the State.

When an accused challenges the sufficiency of the evidence, this court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human

33

> atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

Our criminal code provides that "[a] person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." T.C.A. § 39-11-403(a) (2018). As the Sentencing Commission Comments to this section explain, a person who "facilitates" the felonious conduct of another knowingly furnishes substantial assistance, but lacks the intent to promote or assist in, or benefit from, the felony's commission. *Id*.

**1. Defendant Colbert**

Defendant Colbert argues that the State merely "presented examples of his connections with other individuals charged in this case" but failed to present evidence that he was a shooter or that he assisted anyone in shooting.

The evidence, viewed in the light most favorable to the State, showed that, on the night of December 17, 2015, Defendant Colbert contacted Mr. North to obtain a gun after Mr. Perry's mother had been shot. About an hour after Mrs. Perry was shot, a group of men that included the defendants and Mr. Perry arrived at Mr. North's sister's apartment where they remained until 9:00 p.m. and then left to go "west." All of the men were armed with guns. At around 10:00 p.m. in Lonsdale Homes, Mr. Patrick observed a group of men, dressed in dark clothing, walking down the street. One of the men, who Mr. Patrick later identified as Defendant Colbert, separated from the group and approached Mr. Patrick. Using language specific to the Bloods gang, Defendant Colbert inquired about Mr. Patrick's gang affiliation. Mr. Patrick reported to the police that Defendant Colbert had a gun in his waistband at the time of this interaction.

Concerned about the presence of Blood gang members in Crip territory, Mr. Patrick returned inside, urged his grandmother to go upstairs, and called to warn Louis McNair. Unfortunately, the shooting had already occurred, and Louis had fled the area. At the Lonsdale shooting scene, law enforcement recovered thirty-four shell casings that were fired from four different weapons.

In January 2016, KPD stopped a car for speeding. Defendant Williams was one of the passengers in the vehicle and underneath his seat law enforcement found a .40 caliber pistol. Forensic testing revealed that this pistol was one of the guns that ejected eleven casings at the Lonsdale shooting and was the gun that shot and killed the victim.

In April 2016, Defendants Colbert and Williams were inside a vehicle that evaded police. Ultimately, Defendant Colbert, Defendant Williams, and one other passenger fled on foot through Morningside Park. Police officers pursuing the men witnessed them throwing objects as they fled. A little more than a week after this foot pursuit through Morningside Park, a city employee notified law enforcement of a 9mm pistol lying in the park. Forensic testing revealed that this gun had fired eleven of the shell casings recovered at the Lonsdale shooting scene.

Mr. North testified about his presence at the Green Hills shooting and the shock and distress of finding Mr. Perry inside the BMW. He cooperated with the police that night, causing the defendants to believe that he provided the police with incriminating information about the Lonsdale shooting. This caused tension between Mr. North and the defendants. In April, Defendant Williams arranged with Mr. North to meet in order to retrieve a bag he had left at Mr. North's apartment. When the men met at a place designated by Defendant Williams, Defendant Williams fired a gun at Mr. North, striking him eight times. Shell casings recovered from this shooting were analyzed and the testing confirmed that the gun recovered from Morningside Park was the same gun used to shoot Mr. North.

Considering this evidence, the jury could reasonably conclude that Defendant Colbert was present at the Lonsdale shooting and knowingly furnished substantial assistance in the commission of the felonies committed at the Lonsdale shooting. Defendant Colbert's role in arranging to obtain a gun from Mr. North and his presence with Brandon Perry and the other defendants, who were all armed, as they left Mr. North's residence to drive to the Lonsdale neighborhood demonstrate his knowledge and participation in the shooting. Mr. Patrick's testimony places Defendant Colbert with the group of men who were in the Lonsdale neighborhood walking toward the Badgett residence. Defendant Colbert, who had a gun in his waistband, noticed Mr. Patrick exiting his home and inquired about his gang affiliation shortly before the shooting began.

Accordingly, we conclude that there was sufficient evidence upon which a jury could find, beyond a reasonable doubt, that Defendant Colbert furnished substantial assistance in the commission of the murder of the Zaevion Dobson and the attempted murders of Xavier, Louis, Zack, Kiara, and Faith and by procuring a gun to accomplish the shooting. Defendant Colbert is not entitled to relief as to this issue

## 2. Defendant Williams

Defendant Williams asserts that the State failed to produce sufficient evidence that he facilitated: the first degree murder of Zaevion Dobson, the attempted murders of Zack, Faith, Louis, Xavier, Kiara, Ms. Colbert, and Ms. Colbert's children, or the use of a firearm during the commission of those offenses. He argues that the evidence against him is "entirely circumstantial" and that no one on the porch of the Badgett residence identified him as a shooter.

As to Defendant Williams contention that the evidence is entirely circumstantial, we note that the review of evidence, whether direct or circumstantial, is the same. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). The evidence, viewed in the light most favorable to the State, showed that Defendant Williams was with Defendant Colbert when he went to Mr. North's apartment to retrieve a gun before heading out "west." The defendants stayed for awhile but left at 9:00 p.m. At around 10:00 p.m., Mr. Patrick observed a group of men, dressed in black and acting suspiciously, walking down the street toward the Badgett Street residence. Mr. Patrick believed the men to be Bloods gang members based upon his conversation with Defendant Colbert, their behavior, and their dark clothing. Shortly after Mr. Patrick saw the men, the shooting occurred.

Later that same night, Defendant Bassett's black BMW crashed into a Green Hills apartment building. Mr. North saw Defendant Williams standing at the crashed BMW and officers interacted with a distraught Defendant Williams at the crime scene. Defendant Williams admitted to Investigator Loeffler that he was with Defendant Bassett for the rest of the night following the Dallas Street shooting. A month later, during a traffic stop, law enforcement recovered a gun from underneath the seat Defendant Williams occupied at the time of the stop. Forensic testing determined that this same gun had fired some of the shell casings recovered from the Lonsdale shooting and the bullet parts recovered from the victim's body.

In April 2016, Defendant Williams was involved in another traffic stop. This time, however, he, as the driver, did not comply with the stop and led the police on a pursuit. Defendant Williams stopped the vehicle near Morningside Park and Defendant Williams, Defendant Colbert, and another man fled through the park, disposing of items

as they ran. Two days later, a city employee found a 9mm gun and notified the police. Forensic examination confirmed that the gun recovered from Morningside Park was the gun Defendant Williams used to shoot Larry North and, also, one of the guns used at the Lonsdale shooting. According to Mr. North, Defendant Williams left Mr. North's residence carrying a gun before the Lonsdale shooting. The forensic evidence indicated that, other than Mr. Perry and Mr. Bassett, there were two other guns fired at the Lonsdale crime scene. Based upon Defendant Williams's connection with two of the guns involved in the Lonsdale shooting, a jury could reasonably infer Defendant Williams participated in the shooting.

Accordingly, we conclude that there was sufficient evidence upon which a jury could conclude that Defendant Williams furnished substantial assistance in the Lonsdale shooting that killed the victim. Defendant Williams is not entitled to relief as to this issue.

### E. Cumulative Error

Lastly, Defendant Williams contends that the cumulative effect of the errors in this case deprived him of a fair trial. Having considered each of the issues on appeal and concluding that the trial court did not err, we need not consider the cumulative effect of the alleged errors. *State v. Hester*, 324 S.W.3d 1, 77 (Tenn. 2010) ("To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed.").

### III. Conclusion

In accordance with the foregoing reasoning and authorities, we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE